Stanard J.
The appellees, alleging that the appellants as a corporation have become extinct pending this appeal, by the expiration of the term of their incorporation, have moved for an order directing the abatement of the appeal. In opposition to this it is suggested, that during the corporate existence of the appellants, they made an assignment of their rights in the subject involved in this case; and on behalf of the assignees it is insisted that the appeal should not be abated, but should be heard and decided in the names of the parties to the appeal, or that if the expiration of the charter of the appellants preclude the hearing of the case, and to that hearing a revivor in the name of some existing person, legal or natural, be necessary, process of revivor should issue in the name of the assignees. The appellees, without conceding the fact of the assignment, contend that the case cannot proceed but in the names of existing parties, and must be abated unless it can be revived in such names; and that it cannot be revived in the names of assignees claiming to be such by act in pais; that of such fact this court cannot take judicial cognizance, as it is matter for supplemental bill in the nature of an original bill. Without ascertaining the fact of the assignment (for it would be useless to enquire into that fact if the appellees be right) the questions arising on the motion have been discussed, and the opinion of the court sought on the matters of law and practice they involve, leaving the fact for further investigation, should the opinion of the court on the matters of law and practice render such investigation necessary.
The questions, then, for solution on this motion are, 1. Is it indispensably necessary to the hearing and de *522 cisión of an- appeal, that it should be revived in the name of existing parties, legal or natural ? 2. If not, can the court enquire into a fact in pais, to shew that such appeal ought to proceed to hearing and decision without su°k revivor 5 and is the fact of assignment to parties who cannot revive, sufficient to shew that the appeal ought to be so proceeded in ? 3. If such revivor be necessary, may the parlies claiming as assignees be allowed to revive ?
Proceedings in error have never been subjected to the rules that govern the proceedings in the original suit, in respect to abatements and revivors.
Until the statute of 1806 was passed, an original suit was abated by the death of either party before interlocutory judgment, and could not be continued by or against the representative; and prior to the statute of 1792, the case had been the same even where the death occurred after interlocutory judgment. (See 1 Rev. Code of 1819, p. 497. ch. 128. § 38. and 1 Rev. Code of 1814, p. 153. [110.] ch. 76. § 20.) But appeals and writs of error did not abate by the death of either party. The other party, or the representative of the deceased, might in such case revive the appeal or writ of error, by scire facias. And the general rule of practice in this court required such revivor preliminary to the hearing and decision of the case. But even this general rule of practice did not require such revivor at the time of the judgment or decree of this court, if the death had occurred subsequent to the argument. And if an appeal was taken from a judgment in favour of a party dead at the time of the judgment, no process from this court was required to make the representative of the decedent a party by name to the appeal.
I have no doubt that the practice of this court was settled in analogy to proceedings in error in England, with modifications however of that practice, which considerations of convenience suggested. According *523 to the practice in England, the proceedings in error abated if the plaintiff in error died before the assignment of errors. If the plaintiff’s death occurred after the assignment of errors, then the defendant was bound to join issue on the assignment, and proceed to have the judgment affirmed, if hot erroneous; and this without a scire facias against the representatives of the plaintiff in error. But the death of the defendant in error did not abate the writ, whether it happened be-f re or after assignment of errors. If before, then the plaintiff in error might make the executors or administrators parties by scire facias ad audiendum errores, and thereby compel a joinder in error. But if the defendant died after the assignment of errors, the case proceeded until judgment of the court of error, as if the defendant were living. 1 Arch. Prac. 216. and cases there cited.
According to our practice, some of the predicaments provided for by the english practice did not occur; for by it, in all cases now, as in all cases before the organization of the courts under the new constitution where the supersedeas, writ of error or appeal was allowed on application to the court of appeals or a judge thereof, the errors are assigned at the time of the allowance of the supersedeas, writ of error or appeal: and had our practice been framed in strict conformity to the english practice, no scire facias would have been necessary on account of the death of either party after the case got into this court. Our practice however, as before stated, has required a scire facias against or in favour of the executor or administrator-, on the death of either the plaintiff or defendant in error. But this must necessarily be confined to those cases in which it is practicable to sue out such scire facias, and admitted of exceptions even where it was practicable, as in the case of death between the hearing and judgment. We then ascertain that the objection to proceeding in error unless there *524 be existing parties, legal or natural, at the time of hear-and judgment, is not insuperable.
The extinction of one of the parties without any legal representative or succession, would, if standing al°ne> forbid further proceedings, because all such proceedings must, from the very fact of such extinction, be wholly abortive. And were this case so situated, the case of Rider v. The Union Factory, 7 Leigh 154. is a distinct and precise authority in favour of the motion. But here a suggestion is made, that the rights involved in this case passed by assignment to living persons before the legal extinction of the party on the record, and that if this case- be proceeded in, and those rights be sustained by the judgment of the court, such judgment will not be abortive, but may be enforced by and for the assignees : and the question is, can this court take notice of the fact of assignment,-as a consideration to influence the exercise of its discretion to proceed, though the assignees are not or cannot be made parties by scire facias ?
If such an assignment has been made, I do not doubt that the right, legal or equitable, which passes to the assignees by it, is in no degree impaired by the subsequent dissolution of the corporation that made the assignment. As such a right may be in the assignees by virtue of the assignment, the power of this court to make a provisional enquiry whether the fact of assignment exists, as a guide for its action on the question propounded by the motion, is inherent in the very nature, of the power that the motion proposes to call into action; if that fact being ascertained should influence the.exercise of the discretion to which the motion is addressed, provided such right would be jeoparded by one course, and no right on either side be compromised by the other.
Suppose this appeal should be abated ; then the error (if any) in the decree of the court below is not open *525 to the correction of this court, and the counsel on neither side has suggested a mode by which it can be corrected, or the judgment of the appellate court be had on it. I should very reluctantly sanction the united propositions, that the case cannot proceed here without revivor, that it cannot be revived and must be abated, and that the error, (if any) in the decree cannot be corrected by any proceedings that the party whose rights are or may be affected by it, may institute. Look to the consequences of the maintenance of these propositions. They leave the decree of the court below in full vigour, however erroneous it may be, and deny the application of the correcting hand of this court, or any other, to the error. Suppose the decree had been for a large sum of money in favour of the then existing but now dissolved ^corporation, and that after the decree, and before or after the allowance of the appeal, the corporation still existing had assigned the decree. The dissolution of the corporation pending the appeal would furnish the same inexorable necessity for the abatement of the appeal as now exists. Such abatement would leave the decree in force, and the appellants liable to be charged with it by the assignees, in like manner as though no appeal had been allowed : the decree might be enforced at the instance of the assignees, and the parties charged by it might have no means of correcting the error, however gross. Such a consequence infers the unsoundness of the argument or pretension that leads to it. Without saying that there is no other remedy to protect the rights that may arise out of the suggested assignment, against the effect of the error (if there be one) in the decree, the most compendious means of giving that protection is to permit the case to proceed without notice of the dissolution of the corporation appellant, if that be within the power of the court: and I am satisfied that that power exists.*
*526 The other judges concurred. Whereupon (the fact of the assignment by the bank not being, now further controverted) the cause came on to be heard upon its merits, before the president and judges Broolce, Allen anc^ Baldwin,* and was elaborately argued by C. and G. N. Johnson for the appellants, and Patton and Harrison for the appellees.
Baldwin, J.
The appellants seek to set aside the voluntary settlement made by Robert Patton upon his wife and children ; and claim the right to do so in the *527 character of subsequent creditors, and also in that of subsequent purchasers. Let us first examine their pretensions as creditors.
In the case of Hutchison and others v. Kelly, ante, p. 123. I had occasion to examine the principles upon which, under the statute against fraudulent alienations, conveyances are treated as fraudulent and void in regard to creditors; and to express the opinion, that the statute of 13 Elizabeth, ch. 5. from which so much of ours as relates to that subject is substantially taken, looks mainly to the intent with which the act is done, and if that be fraudulent avoids it, not only as against creditors who are actually, but also against those who might be disturbed, hindered, delayed or defrauded ; thus treating creditors as a class of persons entitled to the protection of the law, and embracing not only those existing at the time, but moreover subsequent creditors: that where there are no existing creditors, the fraudulent intent, if conceived, must of course be prospective, with a view to future indebtedness; but that where directed against existing creditors, it operates also in relation to those subsequently arising, a fraudulent intent as to one or more creditors being fraudulent as to all: that upon the question of fraudulent intent, the courts have of necessity resorted to a legal presumption arising out of the general nature of the case, and to marks or badges of fraud furnished by the particular circumstances: that the legal presumption is founded upon a comparison of the consideration for the conveyance, with that which constitutes the just claims of creditors ; and though voluntary conveyances are not mentioned in the statute, their true character and effect are necessarily involved in its application: and that the legal presumption of an alleged fraudulent intent arises where the conveyance is voluntary, though meritorious, if the grantor be indebted at the time, but is only prima facie, and may be repelled or confirmed *528 by the particular circumstances of the case; but is rendered conclusive, if the debts be unsecured, by a degree of indebtedness 'amounting to or approaching insolvency. For the reasoning and authorities that were relied on to sustain these propositions, I must refer to the reported case; and I recur to them now with the view of ascertaining how far they are applicable to the case before us.
In the present case, it will be seen from an inspection of the bill, that it does not-charge a fraudulent intent against the plaintiffs or any other subsequent creditors of the grantor; nor even a fraudulent intent in point of fact against his creditors existing at the time of the settlement: but, merely averring that the settlement was voluntary, and made when the grantor was greatly indebted, relies upon the supposed inevitable conclusion, that in point of law it is fraudulent and void against the plaintiffs and all his other creditors, whether prior or subsequent to the conveyance. The bill, moreover, does not even allege that the plaintiffs have in fact been disturbed, delayed or hindered in the recovery of their demand; and all the circumstances of the case shew that no such impediment has been occasioned by the settlement in question. On the contrary, the delay has been altogether voluntary on the part of the plaintiffs, and occasioned by the course of conduct which they have thought proper to pursue in relation to the subject. The bill, in stating the original debt to the plaintiffs, goes no further back than the 27th of April 1811, the date of the deed of trust executed by Patton and wife to W. Herbert, to secure any sum or sums of money then, or which thereafter might be, due from Patton to the president and directors of the bank: which deed conveys the Spring banlc tract of land, embraced in the settlement in question, and also two other tracts of land, one of them conveyed to Patton by Hepburn in April 1809, and the other conveyed to *529 him by Scott and others in June 1810. It appears from the recital of this trust deed, that the bank had already been secured on the same account, by Patton’s conveyanee in trust to the same W. Herbert, about a month previously, of 2000 dollars worth of stock in the Farmers bank of Alexandria, and other property; in lieu of which he was permitted to substitute the security last furnished.
I think there can bo no doubt, that at the time of the making of this trust deed of the 27th of April 1811, the plaintiffs had notice of the deed from Patton to Sanderson and Stewart, and the deed from them to mrs. Patton and her children, the former of the 20th and the latter of the 21st of March 1807; which two deeds constitute the voluntary settlement now impeached. The property, real and personal, which was the subject of that settlement had, at the date of the trust deed, been conveyed to the trustee W. Herbert, by an absolute deed of the 10th of April 1811, executed by Patton and wife, but not perfected by the privy examination of the latter, which deed expressly refers to the deed from Sanderson and Stewart. In all probability, the deed of the 10th of April was intended to divest the right acquired by mrs. Patton under the settlement, in order that it might be reconveyed by Herbert to Patton, and by him conveyed in trust for the bank; for we find that such a reconveyance was made by Herbert, but by some mistake is posterior in date to the trust deed. However this may be, it is manifest that Herbert, the trustee, had notice of the settlement: and without relying upon the legal inference from that fact, of notice to the bank, the fact itself, taken in connexion with the due recordation of the deeds of settlement, and the attestation of them by several eminent professional gentlemen of the town of Alexandria, one of whom is also a witness to the trust deed, renders it extremely improbable that the plaintifFs were ignorant of the existence *530 of those deeds; and every doubt upon the subject must be removed by the silence of the plaintiffs, who make no pretence of such ignorance in their bill, though it r • would have been a material circumstance, if the voluntary settlement had been concealed from them, and they induced to trust the grantor upon the faith of property embraced therein.
The bill gives no information of the intermediate dealings between the plaintiffs and Patton, from the date of the trust deed of the 27th of April 1811, until the procurement of that of the 29th of September 1824, executed by Patton and wife to Colin Auld and Robert J. Taylor as trustees, conveying the same property, to secure the amount therein stated to be due from Patton to the bank, of 8920 dollars 60 cents principal, with some interest. After this delay of the plaintiffs in the prosecution of their original demand, of between 13 and 14 years, a further, and, I would think, unusual forbearance for a bank towards its debtor was stipulated by the terms of the last deed ; which gave indulgence for the whole debt for three years, with the privilege of extending it, in part, to seven, by paying up one third at the expiration of the three years, and one half of the remainder at the expiration of five. This new indulgence, thus made the subject of contract, though granted without any additional security, was not, it seems, without a new consideration intended to enure to the benefit of the plaintiffs. There is abundant reason to believe it was connected with an arrangement, by which the debtor was to act in concert with the bank, for the purpose of getting rid of any futur^ adverse claim on the part of the grantees in the settle-j ment in question. It will be seen from the provisions of1 the last incumbrance, that it was not contemplated the settlement should be wholly avoided, but only postponed to the lien of the bank, and subject to that lien, rendered more effectual to the grantees; for it was *531 stipulated, that Patton and his wife, and their representatives, should retain possession and receive the rents and profits of the property conveyed, without account, “ according to their respective interests therein at the time of the execution of this deed;''’ and also that no sale should J . be made of the Spring bank tract of land (the one embraced in the deeds of settlement) until the other two tracts should have been first sold, and the proceeds thereof ascertained to be insufficient; and moreover that if Patton or his executors &c. should, at any time before sale made, pay off the whole amount of the debt &c. or if the same should be raised from the sale of the other tracts, or in part so raised, and mrs. Patton or any of her children, or any one in their behalf, should pay the balance which should be due to the bank, then that the trustees should thenceforth hold the Spring bank tract to the sole and separate use of mrs. Patton for her life, free from the power and control of her husband, and after her death to the use of the children of herself and her husband, with a power of appointment on her part of their respective interests.
This suit was instituted on the 22d of March 1825, about six months after the execution of the last trust deed, and two years and six months before the expiration of the stipulated forbearance. The bill contains no specific prayer for the sale of the property by a decree of the court. Though it states that “the just claim of the plaintiffs to have the tract of land called Spring bank subjected to the payment of their debt, is resisted on the ground that it had been previously conveyed” by the deeds of settlement, it does not state by whom such resistance is made, or that any obstacle is thereby presented to the enforcement of the trust by the trustees. If it were proper to infer such an obstacle from that loose statement, as existing in regard to the Spring bank tract, none such could have existed in relation to the other two tracts, and no reason is as *532 signed for hot subjecting them to sale in the first in- ... ,. , , stance, nor is it alleged that those two tracts were not of sufficient value to. produce the amount due, or that Patton had refused or was unable to make payment, or ^at any legal measures had been resorted to for the purpose of coercing it. And the only specific prayers in the bill (besides those merely formal) are, that Patton may say in his answer, “ whether the deed of the 21st of March 1807, from himself to James Sanderson and William Stewart, was not entered into without consideration, and with a view to have the property therein mentioned settled upon his wife and children ; and whether at the date of that deed he was not largely indebted to many persons: and that the said deed, and the deed of the same date from the said Sanderson and Stewart to mrs. Ann Clifton Patton and her children, may be decreed, as against your complainants, who are both creditors and purchasers, fraudulent and null and void; and that the land called Spring bank may be made or left subject to the just find legal lien and incumbrance, which the bank of Alexandria or you? complainants have upon it.”
Thus it will be seen that the object of the suit was not to coerce payment of the debt, but to render the incumbrance therefor paramount to the title of the grantees in the settlement. This was not in conflict with the individual interest of the grantor; and on the other hand he could not, either at the date of the incumbrance or in the progress of the cause, resist the wishes of the bank on this subject, without forfeiting all claim to further forbearance, though he might hope that an extended indulgence might enable him to relieve himself from his difficulties, without ultimate injustice to his family. We see from the bill, drawn with a studied avoidance of offensive imputations, that the plaintiffs sought to obtain from him an admission which they thought would subserve their purpose; and his *533 answer shews that they were not disappointed. He does admit in his answer (filed for himself and wife) that at the date of the voluntary settlement, “ he did owe sundry debts, some of them of considerable an admission too broad, as will be presently seen, for the facts of the case, and against the making of which he was warned by the witness Sanderson, who swears that he was well acquainted with his circumstances at that period, and that he told him, that if called upon as a witness, he would have to contradict him. An answer was moreover procured from a guardian ad litem, for the infant grantees, who had been appointed on the motion of the plaintiffs, which is of an extraordinary character; for the drift of it is to impugn rather than sustain the rights of those defendants.
This state of the case was quite unfavourable to the grantees, and no active defence was made on their part until the death of Patton, when a new aspect was given to the cause. The guardian ad litem was removed by an order of the court, and mrs. Patton, then sui juris, appointed in his stead; and she was permitted to answer de novo, as well for herself as the infant defendants : and mrs. Mason, the only adult amongst the children, and who had formerly answered with her husband, by leave of the court filed her separate answer. And the parties, for the first time, proceeded to the examination of evidence.
The foregoing views have not been presented for the purpose of shewing that if the plaintiffs have made out their case upon the merits, by establishing the settlement of 1807 to be fraudulent and void against the creditors of the grantor, relief should be denied them because of a defective structure of their bill, or of the course of conduct they have pursued, either before or since the institution of this suit. My purpose has not been to go into the consideration of any such questions ; but merely to deduce, from the facts I have stated, the two following propositions:
*534 1. The plaintiffs not having charged in their bill that the settlement was made with a fraudulent intent in point of fact, they must prove the averments relied on by them as warranting the conclusion that the transac*’011 was fraudulent and void by intendment of law; and instead of relying upon a prima facie presumption from mere indebtedness, to throw the burthen of proof on the opposite party, ought to establish such an extent of indebtedness and inadequacy of resources, as will serve to shew that the grantor, at the time of the settlement, was in a condition amounting to or approaching insolvency.
2. The plaintiffs having notice of the voluntary settlement, and instead of resorting to legal proceedings for the purpose of placing themselves in an attitude to complain of being delayed, hindered or defrauded thereby, (Colman v. Croker, 1 Ves. jun. 160.) having, by taking their first incumbrance, assumed the settlement to be fraudulent; and instead of proceeding to enforce that incumbrance, as they were authorized by its terms to do, within a reasonable time, so as to give those claiming under the settlement an opportunity to assert and prove its validity, having continued to indulge and deal with the grantor for a number of years; and having thereafter taken a second incumbrance on the same property, by which they bound themselves to extend still further forbearance; and having, by a combination with the grantor, enlisted him against the interests of his own family, whose disabilities required his protection; these circumstances furnish a strong presumption against the pretensions of the plaintiffs, which ought to be overcome by unobjectionable and plenary proofs on their part.
If these propositions be correct, the merits of the plaintiffs’ cause, in their character of creditors, will require but a brief consideration. Let us first dispose of the admissions in the pleadings on the part of the de *535 fendants. If the admissions in the answer of Patton ... ... .... , be evidence against his grantees, as to which, m such a case as this, I express no opinion, still I can give no weight to them, for reasons already suggested. As to the separate answer of mrs. Mason and the previous joint answer of herself and husband, they put the most material allegations of the bill in issue. But there is an admission in the answer of mrs. Patton, filed for herself and as guardian ad litem for the infant defendants, which seems to require a cursory notice. After denying that her husband was involved in debt at the time of the settlement, and alleging on the contrary that he was in unembarrassed and prosperous circumstances, and able to meet all his engagements, she admits that he owed at that time a debt to John Laird of Georgetown, on which a balance still remained due, including interest, of about 1200 dollars. This admission she does not profess to make on her own personal knowledge, and we need not enquire how far it was correct; for though it might conclude her in her lifetime, and her representatives after her death, it could not affect the other grantees, as they do not claim under her; and it cannot be used against them as having been made by their guardian ad litem, for no rule is better settled than that an answer of an infant by guardian cannot be read against him at all, for any purpose. 2 Madd. Ch. Pract. 278. Mitf. Plead. 314. 315. 1 Stark. Ev. Pt. II. p. 278.
Let us now briefly advert to the evidence which has been examined in relation to the degree of the grantor’s indebtedness, and the extent of his resources. And it is remarkable that the testimony establishes only a single debt as due from him at the date of the settlement, to wit, a debt of £ 678.11. sterling money, to the above mentioned John Laird. It was material for the plaintiffs to prove, if they could, not only that this debt was subsisting at the date of the voluntary settlement, but that it has ever since continued; for their right to im *536 peach the settlement depended, under the circumstances of the case, upon the question whether it was fraudulent and void against creditors then existing. Now, if it was fraudulent and void against such creditors, though it follows that it would also be liable to be so treated by subsequent creditors, and that the mere fact of the debtor afterwards paying off the demands of the former would not render the transaction valid as to the latter, yet it would be a circumstance entitled to weight upon the question of fraud. That the debt to Laird remained unpaid, if such was the fact, the plaintiffs had not onty the complete power to prove, but it lay directly in their way to prove it; for they examined Laird as a witness in their behalf; and he deposed that Patton owed him about the year 1806, and several years after-wards, the debt above mentioned. But there they suffered the examination to rest; and the reasonable inference from his deposition surely is, that the debt was in some way discharged, some years after 1806; the more especially when we couple with his evidence the presumption arising from the great lapse of time, and his failure to assert a demand. It is not easy to account for the language of his deposition, and his quiescence, but by the supposition that the debt has been either paid or secured to him. Such may not be the fact, but it is the legitimate deduction from the evidence, which cannot be repelled by the admissions above noticed.
But if it were even granted that the debt to Laird still remains unsatisfied, the evidence is far from establishing that Patton was at the time of the settlement insolvent or greatly embarrassed in his circumstances. On the contrary, I think it is proved that he was then, and for several years afterwards, able to meet all his engagements; the owner of property to a considerable amount; in good credit and extensive business; having the command of large sums of money-; and unindebted except to mr. Laird, who would seem to have *537 been a most indulgent and even careless creditor. The plaintiffs have introduced a good deal of evidence, for the most part of a loose, indirect, and unsatisfactory description, tending somewhat to shew that the grantor, from the nature of his engagements and connexions in business, had reason to apprehend a disastrous turn in his affairs ; from which it has been argued that the purpose of the settlement was to make some provision for his family and himself against the misfortunes which afterwards fell upon him. But this evidence is too vague and inconclusive to justify the imputation of fraud, the more especially upon a bill which charges no fraudulent intent in point of fact. And though there are circumstances in the matter, the manner and the details of the settlement, calculated to attract the vigilance of suspicion, and which have been laid hold of and handled by the appellants’ counsel with great address and ability, they will be found upon examination to be more imposing than substantial. It is manifest that there was no secret trust in favour of the grantor, nor even an immediate benefit secured to the grantees; and no disguise as to the nature and effect of the conveyances. The deed to Sanderson and Stewart was avowedly without consideration, and merely to avoid the formal difficulty of a direct conveyance from the husband to the wife ; and their conveyance to her, being without the intervention of a trustee, of course subjected the property, during the marriage, to the marital rights, dominion and control of the husband, and, to the extent of her estate in the subject, to the legal process of his creditors. His continuance in possession was not inconsistent but perfectly compatible with the title; and the use and enjoyment of the property, even of those portions of it which would necessarily be consumed in the use, (subordinate however to the remedies of his creditors) was a legitimate incident of his limited *538 interest. In this respect the case of Parker v. Proctor, 9 Mass. Rep. 393. was far stronger than this; for there the continuance in possession of the grantor, he being the rather and natural guardian ot the infant grantee, wa® not considered indicative of fraud, though otherwise inconsistent with the terms of the deed. The circumstance, therefore, that the deed was to the wife and children, instead of a trustee for them, is not a mark of fraud, but the reverse; since if a fraud was contemplated, it must have been in securing the property to the grantor’s family after his death, against his creditors, without intermediate advantage to himself; a design which, though not impossible, must be admitted to be of but rare occurrence. A circumstance, moreover, not without its weight in estimating the fairness of the transaction,’ is the due and prompt recordation of the deeds, (Sexton v. Wheaton, 8 Wheat. 251.) besides the attestation of them by highly intelligent and respectable witnesses; thereby precluding the idea of intended concealment.
The foregoing views of the question have led me to the conclusion, that the pretensions of the plaintiffs in their character of creditors cannot be sustained. It remains for me to notice their pretensions in the character of. purchasers.
The plaintiffs, as incumbrancers, can stand upon no higher ground than absolute purchasers who have paid a full consideration and received a direct conveyance of the property. There is no charge in the bill that they were induced to become incumbrancers by the fraud of Patton, or that they had not notice, at the time, of the settlement he had made upon his wife and children. The naked question is therefore presented to this court, for the first time, whether a voluntary conveyance of that kind is fraudulent and void in regard to a subsequent purchaser for valuable consideration, who had notice thereof at the time of his purchase.
*539 Our statute against fraudulent alienations is eontained in the 2d section of the “ act to prevent frauds and perjuries,” 1 R. C. p. 372. ch. 101. and is a condensation into one joint enactment, of the most important provisions as well of the statute 27 Eliz. ch. 4. in regard to purchasers, as of the statute 13 Eliz. ch. 5, in regard to creditors. In the construction however of our statute, it must be considered distributively; there being material points of distinction arising out of the difference between the two subjects, to wit, frauds against creditors and frauds against purchasers. Fraudulent conveyances in relation to purchasers must in the nature of things be exclusively prospective, as they cannot be directed against existing interests, but only against those thereafter to arise. The indebtedness of the grantor at the time of the convej'ance is, as we have seen, a material circumstance in reference to even subsequent creditors. But I regard it as wholly immaterial in reference to subsequent purchasers. There is, it is true, a dictum of lord Mansfield to the contrary in Doe v. Routledge, Cowp. 713.; and in Holcroft’s case, Dyer 294. in note, (cited in Atherley on Marriage Settlements, p. 199. note 1.) the circumstance of the grantor’s freedom from indebtedness is relied on; and so that idea is expressed in Style 446. (cited in 9 East 63.) and is adopted by baron Gilbert in his Law of Evidence, p. 307. But a moment’s reflection will serve to shew that the grantor’s indebtedness can only be material in regard to creditors; for a fraudulent purpose against them can have no connexion with, or tendency to promote, a fraudulent purpose against a subsequent purchaser. Besides, the reason why a voluntary conveyance is ever regarded as fraudulent against creditors, is, that it withdraws the grantor’s property from their preeminent demands; whereas the grantor owes no duty to a purchaser till the relation between them is about to arise; and then his only duty is to abstain *540 from selling to him what he had previously conveyed away to another. It is the violation of this duty which constitutes the fraud against a subsequent purchaser; and not the mere intent with which the voluntary conveyance is made; for though that is a prominent matter in the statute, it is obviously idle unless it be accomplished, as there must be a purchaser to be defrauded, as well as an intent to defraud; which concurrence amounts to actual fraud.
Thus, according to my reading of the statute, the purchaser must be actually defrauded; and how that can be where he has notice of the prior voluntary conveyance, is altogether beyond my conception. Quod non decipitur qui scit se decipi, is a maxim of law, as well as of common sense ; and the disregard of it by the expounders of the law can result in nothing but unqualified mischief. What protection can it afford to a purchaser with notice, to avoid the previous conveyance, except against the consequences of his own officious intermeddling ? Was that the mischief intended to be provided for ? Most assuredly not. The spirit of the statute is to set aside conveyances by which subsequent purchasers are deceived, and would otherwise be injured ; and such is the fair import of its language. It was enough to make void the accomplishment'of a fraudulent design on the part of the vendor, directed against the purchaser, and to sacrifice to that object the rights of the voluntary grantee, however innocent of all participation in the covinous purpose. In this result the statute goes beyond the common law, which recognized a conveyance to an innocent grantee, if made for a good consideration, such as natural affection, as paramount to the claim of a subsequent purchaser for a valuable consideration, though without notice. But it goes no further. It could never have been contemplated to sacrifice the innocent grantee, without •necessity, to protect a purchaser who could only be in *541 jured by his own folly or his own injustice. As to a purchaser without notice, the deceitful act of concealing the previous voluntary conveyance may well be referred back to an original fraudulent design on the part of the vendor when he made the conveyance : but when there is no effectual concealment, there is no room for such relation; and if the conveyance be held void, it must be upon the idea that the statute was directed not only against all fraudulent, but against all voluntary conveyances, however fair and meritorious, and was intended to enable the grantor to revoke his grant at pleasure, by means of a combination with a subsequent purchaser. If such had been the intent of the legislature, why was it not directly expressed, instead of leaving so important and comprehensive a provision to a vague and circuitous implication ? And why should the courts strain the words of the enactment, upon the imagination of a policy not only absurd but mischievous ? It is easy to perceive that the effect of such a construction is to defeat the just expectations of innocent grantees, and of their families and creditors, and to destroy their vested rights and lawful enjoyment, whenever the grantor, from passion or caprice, or the undue influence or improper practices of others, may be induced to recaí the provision or advancements he has made, not only upon a meritorious consideration, but in obedience to a sacred duty. I am not prepared for such a result, unless driven to it by an irresistible pressure of authority.
The precise proposition, be it observed, which we are called upon to decide is, that a voluntary settlement of real estate, made, without actual fraud, by the grantor upon his wife and children, is by operation of the statute to be deemed conclusively fraudulent and void, against a subsequent purchaser from him for a valuable consideration, with full notice of the prior conveyance. The negative of this proposition, as re *542 marked by lord Ellenborough in Doe v. Manning, 9 East 63. where he reviews the cases, is expressed in some of those nearest to the statute of 27 Elizabeth, but the affirmative has been held by numerous decisions, and must now be regarded as the settled doctrine of the english courts; though a construction condemned by lord Mansfield in Doe v. Routledge, Cowp. 705. and opposed to the opinions of lord Hale, lord Rolle, chief baron Gilbert and chief justice Eyre, as observed by Spencer, J. in Verplank v. Sterry, 12 Johns. 555. and which is disapproved, though submitted to, by lord Ellenborough, lord Thurlow, and sir James Mansfield, (Doe v. Manning, above cited; Evelyn v. Templar, 2 Bro. C. C. 149. and Doe v. Martyr, 4 Bos. & Pul. N. R. 335.) and controverted by several respectable writers; 1 Fonbl. Eq. 280. n. Alherley on Marriage Settlements, p. 196. 197. 198. An examination of the cases will serve to shew, that while the weight of authority decidedly sustains the affirmative construction, it strongly impugns its correctness; for in most if not all the later cases, the judges yield merely to what they consider the current of adjudication, and though without a struggle, yet not without evident disapprobation or regret. The ruling motive with them is entitled to commendation : they are unwilling to disturb an established error, lest by so doing they should disturb the titles to estates. I think we may safely refuse to adopt it, for the like reason. In Virginia, so far as my information extends, there is no reason to apprehend that any estates are held by so frail a tenure as the expectation of the adoption of an unreasonable and unjust principle, which has never yet received the sanction of our judicial tribunals, nor the approbation of the legal profession. The structure of.our society and the habits of our people have led to the surrender and distribution by parents, while living, of. portions of their estates amongst their children; and when these are perfected by conveyances *543 duly registered, the grantees become known to the world as both ostensible and real owners of the property, enjoying all the rights and incidents of ownership. This state of things would be most mischievously affected, both retroactively and prospectively, by the establishment of the doctrine in question: whereas in England the evil has been greatly mitigated by the practice of marriage settlements, in our country as yet almost unknown. It is difficult to believe that our legislature, when they were engaged in 17S5, shortly after the consummation of our independence, in condensing and abridging the english statute, thought they were adopting a construction of it not then established by the english courts; the more especially when we find that by the omission of the preamble, and part of the enacting clause, they have stricken from the advocates of the affirmative proposition their most plausible argument, by which the latter have made the proviso to mean directly the contrary of what it expresses. The proviso of the statute 27 Elizabeth, and of our statute, excepts out of the operation of the act conveyances made “ for a good consideration and bona fide,” while the preamble of the english statute speaks of purchases for money or other good consideration, and the enacting part declares that fraudulent conveyances shall be void against purchasers for money or other good consideration. And from this it has been argued (see Atherley on Marriage Settlements 190. 191.) that by the words “ good consideration” in the proviso must be understood valuable consideration. I need not consider the weight of this argument, which makes the proviso a mere nullity. It is enough for our purpose, that it has no foundation to rest upon in our statute.
The decisions of the english courts since our separation from the mother country, though entitled to great respect, are not obligatory here. The cases prior to that period are certainly not in harmony; and Spencer, J. *544 states, in Verplank v. Sterry, 12 Johns. 555. (though in opposition to the idea of chancellor Kent, as reported in the case from the court below under the name of Sterry v. Arden, 1 Johns. Ch. R. 270.) that the preponderance *n we‘ght and number is decidedly adverse to thé doctrine which now prevails in the courts of Westminster hall. However that may be, in Cathcart &c. v. Robinson, 5 Peters 264. chief justice Marshall, delivering the opinion of the court, says: “ There is some contrariety and some ambiguity in the old cases on the subject; but this court conceives that the modern decisions establishing the absolute conclusiveness of a subsequent gale to fix fraud on a family settlement made without valuable consideration—fraud not to be repelled by any circumstances whatever—go beyond the construction which prevailed at the american revolution, and ought not to be followed. The universally received doctrine of that day unquestionably went as far as this: A subsequent sale without notice, by a person who had made a settlement not on valuable consideration, was presumptive evidence of fraud, which threw on those claiming under such settlement the burthen of proving that it was made bona fide. This principle, therefore, according to the uniform course of this court, must be adopted in construing the statute of 27 Elizabeth as it applies to this case.” Let this last proposition be conceded, though I express no opinion bow far a purchaser might be affected by a culpable negligence in not searching the registry, especially when coupled with open possession on the part of the grantee ; still it can avail the appellants nothing in the present case. Apply the presumption to the appellees here; and if my views are correct, it is completely repelled by the fact of actual notice on the part of the appellants when they took their incumbrances.
For the reasons above stated, I am of opinion that the appellants have not sustained their pretensions, *545 whether in the character of creditors, or in the character of purchasers; and, therefore, that there is no error in the decree of the circuit court dismissing their bill.
Allen, J. and Cabell, P. concurred. Brooke, J. was absent at the time of the decision : but the president stated that he was authorized by him to say, that if present he would also have concurred.
Decree affirmed.

 Note by the reporter. The case of the State Bank of North Carolina v. Cowan &c. 8 Leigh 238. was an action of debt brought *526 by the bank, in 'which the circuit court gave judgment for the defendants, and the court of appeals in April 1837 reversed that judgment and rendered judgment for the bank. After the judgment of the court of appeals, execution issued in favour of the bank against the defendants Cowan, May, Smith and Jones, which was levied on the goods of May, and he gave a forthcoming bond with surety, which was forfeited. When a motion was made on the forfeited forthcoming bond, the defendants produced evidence shewing that the charter of the bank had expired pending the appeal, to wit, on the 1st of January 1835, and on this ground asked the court to quash the forthcoming bond, and the execution under which it was taken. But it appearing that the judgment on which the execution issued was entered in the circuit court on the 12th of May 1837, in pursuance of the judgment of the court of appeals, and that the execution was in strict conformity to that judgment, the circuit court overruled the motion to quash, and rendered judgment on the bond. On a supersedeas to this judgment, the court of appeals (judges Brooke, Stanard and Allen concurring) reversed the judgment of the circuit court, and entered judgment quashing the execution and forthcoming bond. Baldwin, J. dissented, on the ground that it was incompetent to the defendants to shew that the charter had expired at a period anterior to the judgment of the court of appeals. The three other judges, not regarding that judgment as ascertaining the continued existence of the corporation at its date, held that the execution issued illegally in favour of a corporation whose charter was shewn by the evidence to have expired. This decision was in May 184-3, and the case will be found under the name of May &c. v. The State Bank of North Carolina, in the reports of that period.

 Judge Stanard had been counsel for the appellees, and was unwilling to sit in the case when its merits were to be considered.