## Case No. 13,248.

### SPRAGUE et al. v. ADRIANCE et al.

[3 Ban. & A. 124;[1] 14 O. G. 308.]

Circuit Court, S. D. New York. Oct., 1877.

PATENTS — ABANDONMENT — ASSIGNMENT — SCOPE OF PATENT—HARVESTERS.

1. Abandonment is a fact and not a conclusion of law.

2. Where the evidence showed that the inventor, although allowing more than four years

[1] [Reported by Hubert A. Banning, Esq., and Henry Arden, Esq., and here reprinted by permission.]

to elapse from the date of his invention before applying for a patent, nevertheless kept the invention from the public, and it appearing also that he was in straitened circumstances: *Held*, that, under the circumstances of the case, an abandonment was not proved.

[See Babcock v. Degener, Case No. 698.]

3. The rule, that in cases of delay in applying for patents, the intervening rights of other inventors who in the meantime have devised and patented the same thing, should be protected against the delaying inventor, does not apply to the case of the complainants, who did not know of or acquiesce in the acts of the intervening inventors.

4. The case of Consolidated Fruit Jar Co. v. Wright, 94 U. S. 92, distinguished.

5. Whether, if the first inventor is estopped by conduct of his own, his assignees would be, unless shown to have been cognizant of it, quære.

6. The scope of the patent is fixed by what was known at the date of the completed invention, and not by what was known at the time when the application was filed.

7. The first and second claims of reissued letters patent, Number 3,372, granted to Frederick Nishwitz, April 13th, 1869 (original patent dated February 10th, 1858), for improvement in harvesters, *held* valid.

[This was a bill in equity by William Sprague and others against John P. Adriance and others for the infringement of reissued letters patent No. 3,372, granted to Frederick Nishwitz April 13, 1869, the original letters patent, No. 19,377, having been granted February 16, 1858.]

George Gifford and Benjamin F. Thurston, for complainants.

George Harding, for defendants.

WHEELER, District Judge. This suit is brought for relief against an alleged infringement of reissued letters patent No. 3,372, division B, granted to Frederick Nishwitz, and now owned by the orators, for an improvement in mowing-machines, and has been heard on pleadings, proofs and argument. It is found as matter of fact that the invention was made in 1853. The application for the original patent was filed January 12th, 1858.

The defences set up are that Nishwitz is not the first inventor; that he abandoned his invention to the public before applying for his patent, or so conducted himself with reference to it that he was estopped from claiming a patent for it, or any rights under the patent; that the reissue is not for the same invention set forth in the original, and that the defendants do not infringe.

Abandonment itself is a fact, and not a conclusion of positive law, statutory or common, arising from any prescribed state of facts. The lapse of time between the invention and the application was about four years and a half, and large, but there was no fixed limit within which the application must be made; it was not so great as in many cases where patents have been upheld; and the straitened and other circumstances of the inventor were such that, although it was some and quite strong evidence in itself of an abandonment,

it is explained away, and. taken all together, the evidence not only fails to show any abandonment in fact, but on the contrary, shows satisfactorily that he cherished and carefully kept his invention to himself, away from the public, for himself.

During that time other inventors entered the same field, and some of them occupied some of nearly, if not exactly, the same ground, and obtained patents for some of nearly, or quite, the same things now claimed under his, and it is with much plausibility urged that after what occurred he and those claiming under him should in equity be estopped from maintaining the claims now made, and the language of the court in Consolidated Fruit Jar Co. v. Wright, 94 U. S. 92, is especially relied upon in support of that position. With great justice, to the apprehension of all, it is there well and authoritatively said with reference to this subject, as had been many times by many courts before said with reference to others, that he who is silent when he should speak must be silent when he would speak, if he cannot do so without a violation of law and injustice to others. It is to be observed, however, that the case was made to turn upon the defence of purchase, sale or prior use of the invention for more than two years prior to the application, with the consent and allowance of the inventor, provided for by sections 15 of the act of 1836 [5 Stat. 123], and 7 of the act of 1839 [Id. 354], and that of an abandonment in fact; and what was said was apparently said with reference to the justice of those defences, rather than with reference to an independent defence founded upon an equitable estoppel. But if such independent defence was alluded to, the proposition was carefully made to include, as always before, that he who is required to be silent on account of not having before spoken, must have before remained silent when called upon to speak. In that case the inventor appears to have seen others making use of his invention, without claiming it himself, when he must have known that if he did not make known his claim then, and should successfully do so afterward, they would be damnified. He was directly called upon by the circumstances to speak, and, not having spoken, was situated like those witnessing transfers of their property by others without making known their ownership, who have always been estopped from setting it up afterward.

But in this case it is not shown that Nishwitz knew others were making any advancements or investments of either capital or skill on faith that the ground he had begun to occupy was open to all, or that they would not have made them, if they had known all he could have told them. He was never called upon to speak, and so was never silent when he should have spoken. Therefore this rule, just as it is in itself, does not apply to him.

There might, perhaps, be question whether. if the inventor himself would be estopped by conduct of his own, his assigns would be, unless shown to have been cognizant of it, as innocent purchasers of other property must be, in order to be estopped, but that question does not arise here, as the inventor himself is not affected.

The statutes allowed a reissue of the patent on certain grounds for the same invention set forth in the original. The grounds of the application, and the identity of the invention were so made to appear to the patent office that the reissue was granted, and it is valid against the objection made in this respect, unless the difference in the inventions is shown. The original specification and model are shown by copies. The language in which the object of the invention is set forth has been somewhat changed; more full descriptions of some parts of the invention shown by the model have been inserted in place of others, and some so shown have been described in the specification that were not there described before; but in fact nothing has been added to the specification that did not appear before somewhere. The claims have been changed. as the statute warrants, when the invention is in reality the same.

From these considerations it results that the patent is valid for something. It was said in argument, in behalf of the defendants, that the production patented must be compared with things as they were at the time of the application, and, in behalf of the orators, that the comparison must be made as of the time of the invention, in order to determine the scope of the patent. The statute authorized granting patents for new and useful inventions, without other limit. It seems to be quite obvious that the extent of an invention must be ascertained by comparing what the inventor produces with what was before that time known. If he is entitled to a patent at all, he is by the statute entitled to one for that invention so ascertained, and there is no provision for cutting it down to less on account of subsequent inventions, and it cannot be so cut down without engrafting an addition on to the statute by a judicial construction never before given to it.

At the time Nishwitz made this invention there was, so far as shown by this record, as has been pointed out by counsel or observed. no mowing-machine, except Manny's, under his patent of 1851, that had its cutting apparatus attached to the forward part of a frame extending forward toward the ground from and swinging by an axle supported by two wheels, and none at all that had this apparatus attached to any frame swinging with or upon an axle so supported separately from the draft-pole, and none that had a lever to raise or lower the cutting apparatus resting on the draft frame or pole. Manny's had a cutting apparatus hung to a frame so extending forward and swinging, but the draft-pole was hinged to the corner farthest from the grass to be cut and next to the ground, and carried forward to another pair of wheels, to which the team was attached, and the

main wheels ran directly behind the cutters. Sylla and Adams, if they had made the invention patented to them September 20th, 1853, as is probable, had a mower arranged in a manner somewhat similar. Ketchum had a one-wheeled mower, with the cutting apparatus resting on the ground at the side of the wheel. N. T. Allen had a harvester and thrasher, not a mower, with a frame mounted on two wheels and cutting apparatus suspended by rods from it at the front end. Haines had a mower, and there was an English patent for one, with frames so mounted and cutting apparatus suspended by rods from the rear end. Allen's, Haines, and the English patent each had the cutting apparatus extending laterally toward the grass or grain to be cut. Manny's mower had an arm projecting forward from the frame, and adjustable on the forward carriage, and Sylla and Adams' contrivances for straightening up or bending down the line of the frame and draft to raise or lower the cutting apparatus. The English patent had a windlass and Allen's reaper a lever for the same purpose. Haines's mower afterward had a lever resting on the main frame back of the axle, and not on the draft, also for the same purpose. It is claimed for the defendants that the evidence shows this lever was in use on the Haines machines at that time, but the proofs are very conflicting, and it does not fully appear that it was, as is required to establish the defence of priority of invention or use provided by section 15 of the act of 1836, and the decisions in reference to it.

Nishwitz arranged a mower having two wheels with an axle and a frame extending forward from and swinging with it to support the cutting apparatus, and a draft-pole hinged to and vibrating on the axle over and separately from the frame, and provided for raising, lowering and adjusting the height of the cutting apparatus by a lever of the second order pivoted on the draft-pole to draw up or let down a rope or chain passing over a pulley to the frame, adjustable by a pawl. Hinging the draft-pole and frame in that manner upon, and so as to pivot about, the main axle separately, allowing the frame and cutting apparatus to rise and fall without the pole doing so, and arranging the lever, chain and pawl, with which to raise and lower them when desired, were wholly new features in such machines, and would have been so even if Haines had then had in use such a lever as he employed afterward. His cutting apparatus was not carried by any frame vibrating separately upon the axle, and if it was carried by an equivalent his lever was not pivoted upon nor did it rest on the draft-pole nor anything supported by the team to sustain it. By his arrangement the team might to some extent support the lever in raising the cutting apparatus, but it would only be after the pole had been thrown up as far as the tackling would let it go, and then by holding it with their weight from going

higher, not sustaining it with their strength, as in Nishwitz's arrangement. These improvements all appeared in Nishwitz's original specification and model. His original patent did not cover them, but his reissued one, now owned by the orators, does in its first and second claims.

The defendants have the draft pole and frame supporting the cutting apparatus, each pivoted on and vibrating separately about the axle supported by two wheels, and the lever of the second order pivoted on and supported by the draft-pole, and a part of a circle about the pivot end of the lever for the chain to pass over, equivalent for that purpose to a pulley, and the chain passing over the circle to the frame carrying the cutting apparatus, and a ratchet, equivalent to the pawl, for adjusting the place of the lever, all for the purpose of raising, lowering and adjusting the height of the cutting apparatus. Thus the defendants appear to have taken the whole of Nishwitz's invention.

It is said that the object of his invention was to adjust the height of cut, and that the defendants use other means, and not these contrivances, for that purpose. But another object of his invention was to adjust the height of the cutting apparatus in passing obstacles and moving the machine from place to place. The defendants use them for these purposes, and the evidence tends to show that they are used to some extent in their machines for adjusting the height of cut also. To what extent they are used in either respect, either to the profit of the defendants or damage of the orators, is not now to be determined. Either use, as these matters are now viewed, appears to be an infringement. The extent of the use is a proper matter to be determined on an accounting.

Let a decree be entered, establishing the validity of the first and second claims of the patent, that the defendants have infringed the same, and for an injunction and account accordingly.