WOODBURY (THOMAS v.). See Case No. 13,916.

## Case No. 17,970.

WOODBURY PATENT PLANING MACH. CO. v. KEITH.

[4 Ban. & A. 100.] [1]

Circuit Court, D. Massachusetts. Jan., 1879. [2]

PATENTS FOR INVENTIONS—PLANING MACHINES—ANTICIPATION—ABANDONMENT OF INVENTION.

1. The question as to what constitutes an abandonment of an invention, considered.

2. The improvement in planing machines, by which flat bars are placed before and behind the cutters, to keep the stock firm during the operation, instead of rollers previously used, for which letters patent No. 138,462 were granted to Joseph P. Woodbury, April 29, 1873, was not new, having been anticipated by the Anson machine.

3. A feature in a machine, anticipating the invention described in the patent in suit, will none the less anticipate such invention, because the inventor of such anticipating feature had not in view or did not understand the particular advantage of, or function performed by the anticipating feature.

In equity.

E. N. Dickerson, S. A. Duncan, J. A. L. Whittier, and A. A. Strout, for complainant.

B. F. Thurston, D. H. Rice, and Charles E. Pratt, for defendant.

LOWELL, District Judge. The patent in suit, No. 138,462, was issued to Joseph P. Woodbury April 29, 1873, and is for an improvement in planing machines, by which flat bars are placed before and behind the cutters to keep the stock firm during the operation, instead of the rollers which were used by Woodworth, the inventor of this class of machines. This change, though slight, has proved to be of great value, and is now in general use; and this suit is defended by an association of persons who are interested to continue such use. The patentee is dead, and the plaintiffs are a corporation to whom he had assigned his patent.

The history of this grant, which was made twenty-five years after it was first applied for, and twenty-seven years after the invention was completed, is remarkable. The inventor made application June 8, 1848, and appointed an attorney, but did not give him all the usual authority. The power was so worded as not to enable him to withdraw the application. The office rejected the application February 20, 1849, and nothing further was done until October, 1852, when the attorney withdrew the application, and received back $20, of which Woodbury had no notice. In February, 1854, Woodbury instructed Mr. Cooper, a well-known patent solicitor of Boston, who was acting for him

[1] [Reported by Hubert A. Banning, Esq., and Henry Arden, Esq., and here reprinted by permission.]
[2] [Affirmed in 101 U. S. 479.]

in another case, to call up and prosecute this rejected application. There was a misunderstanding as to the invention referred to, and it was only in September, 1854, that Mr. Cooper learned exactly how the case stood. There was, at that time, a rule in the patent office, that an application which should not be renewed or prosecuted within two years after it had been rejected or withdrawn, should be conclusively presumed to have been abandoned. This rule was not always acted on, but Mr. Cooper says that it was very rigid, and that in all his experience, which is understood to have been large, he had not known it to be departed from. I think it a fair inference from the testimony, that Cooper instructed Woodbury that it was useless to attempt to reinstate his case at the patent office. There is evidence that Woodbury thought himself unjustly deprived of a patent, and that he often afterwards expressed a hope that something would be done by congress for his relief. He says, in an ex parte affidavit, which forms part of the record, that he heard in 1869 that Mr. Fisher, then commissioner of patents, had reversed the former rule of presumption arising out of neglect for two years, and that he then intended to apply again, but heard that congress was about to pass a law to meet such cases, and he waited for that.

When revising the patent laws in 1870, congress did enact: "That when an application for a patent has been rejected or withdrawn, prior to the passage of this act, the applicant shall have six months from the date of such passage to renew his application, or to file a new one; and if he omit to do either, his application shall be held to have been abandoned. Upon the hearing of such renewed applications, abandonment shall be considered as a question of fact."

Upon the question of abandonment, it is argued: First, that the decision of the commissioner was final, under section 35 of the statute of 1870 [16 Stat. 202]. But the same statute gives the commissioner, in all cases, jurisdiction of the question of abandonment, and, at the same time, makes the fact a defence upon the trial of the action. Sections 24 and 61 (16 Stat. 201, 208). And this thirty-fifth section was so construed by Shipman, J., in United States Rifle Co. v. Whitney Arms Co. [Case No. 16,793]. Second, that there was a conclusive abandonment by virtue of the statute of 1861, § 12 (12 Stat. 248), which required that all applications should be completed and prepared for examination within two years after the filing of the petition, or, in cases then pending, within two years after the passage of the act, unless it should be shown to the satisfaction of the commissioner of patents that the delay was unavoidable. This was not the case of an incomplete application in 1861, but of one that had been rejected. Third, that Woodbury had actually aban-

doned this invention. Each case, of course, must be decided on its own circumstances; and I am inclined to think that Woodbury had not abandoned his invention. This is a somewhat difficult question to decide, especially as Woodbury cannot be cross-examined; but the general adoption of his improvement which would estop him, if he knowingly permitted it, without taking steps to enforce his rights, appears to have occurred later than 1854, when he had no means, or was advised that he had no means, for such enforcement. This appears to me the turning point upon the matter of abandonment; for that he had, in his mind, any actual intention of that sort, cannot be maintained. I am further of the opinion that the machine built by one Anson, at Norwich, Connecticut, anticipated the invention of Woodbury.

The plaintiffs maintain that most of the evidence in respect of this machine is inadmissible, because the names of the witnesses called to prove this defence were not given in the answer. I was of that impression at the trial, and I think the practice here is to give all the names. The statute is substantially the same as it has been since 1836, excepting that the act of 1870, adopting the decisions of the courts, applied to cases in equity the rule of notice which the act of 1836 [5 Stat. 117] laid down for actions at common law. The rule is now found in Rev. St. § 4920, and declares that the defendant shall state in his answer the names and residences of the persons alleged to have invented, or to have had the prior knowledge of the thing patented, and where and by whom it had been used. I have examined, I believe, all the decisions, and while there are many which speak of notice of the names of "witnesses," yet this is an ambiguous term, which does not necessarily mean that all witnesses are to be mentioned. It was decided by Grier, J., after careful argument, that it was only those persons who had invented or used the machine, or improvement, and not those who were to testify to such invention or use, who must be pointed out. Wilton v. The Railroads [Case No. 17,857]. Nelson and Conkling, JJ., made a similar ruling. Many v. Jagger [Id. 9,055]. Mr. Justice Clifford, in giving the opinion of the supreme court, has twice cited the former of these cases, though not to this precise distinction; and in a third case he has adopted its language. See Teese v. Huntingdon, 23 How. [64 U. S.] 10; Agawam Co. v. Jordan, 7 Wall. [74 U. S.] 596; Roemer v. Simon, 95 U. S. 219.

The deposition of Anson, the inventor of the machine, may be read, because no objection was made at the time of his examination. See Graham v. Mason [Case No. 5,671]; Brown v. Hall [Id. 2,008]; Barker v. Stowe [Id. 994]. And there was notice of the name and residence of one witness to the use of the machine at Norwich.

If the rulings that I have above cited, and which appear to have been adopted or approved by the supreme court, mean that after notice of the name and residence of the inventor, and of the place of use, and of the name of some one who has used it, has been given or waived, all other witnesses may be examined without notice,— and I do not see that it can mean less than that,—then the evidence in this case is all admissible, because Anson invented and used the machine at Norwich, and notice of his name and residence was waived.

Another ground for admitting the depositions relating to Anson's machine, is taken by the defendant. As the evidence was offered, the objection was as follows: "Counsel for complainant objects to the testimony of this witness, for want of notice." It was stated at the argument, and not denied, though it does not appear of record, that when the defendant's counsel gave notice for taking this testimony at Norwich, he did not give the names of the witnesses he intended to examine, and that the complainant's counsel insisted that he was bound to do this by the practice in equity, and that there was correspondence upon this subject. Now, the objection for want of notice might mean, the want of this notice of the names of witnesses to be produced and examined at a particular time and place, according to an asserted practice in equity, a point not now insisted on. When it came to the Reynolds machine, the objection taken was that "neither the name nor residence" of the witness "appears in the answer," etc. Upon this point I do not pass.

The invention of Woodbury was made in 1846, and the machine of Anson was made in 1843. Of the date there is no doubt, for Anson applied for a patent on his invention in 1844. His machine was organized to mould or "stick," as the witnesses call it, sashes for windows, and similar articles, was adapted to planing, and was used for planing slats for blinds. There is no doubt that Anson's machine had bars instead of rollers, for he says so in his specification. The machine has been running ever since, and is in court at present.

Two points are taken against this machine: (1) That the bed is not sufficiently solid to answer the purpose of Woodbury's bed, which is to resist firmly, like an anvil, as he says, the blows of the cutter. Upon the evidence, and upon inspection, I think the bed is a solid bed, within the meaning and use of the Woodbury machine, for all purposes of planing such stock as was likely to be planed upon it. And if the machine were to be enlarged to do general planing work, I see no reason to suppose that a similar bed, modified only as any mechanic would modify it, would not answer the purpose. The solid bed was not new with Woodbury, but was part of the Woodworth organization, which was the starting point of all these ma-

chines, and its benefits were well known and likely to be adopted by Anson. (2) The other question is whether the bars which Anson made instead of rollers, had a yielding pressure. If not, they would not work on an ordinary planing machine, though they might possibly do in a small machine for special purposes. The machine in court has a yielding pressure, by means of weights, which allow the bar to give about three-eighths of an inch. Mr. Waters says about three-sixteenths of an inch; but he is considerably under the mark. To all appearance this organization is as old as the rest of the machine; but as the question of novelty on the part of Woodbury depends upon whether the weights were introduced thirty-five years or thirty-three years since, the appearance is of no great significance. The witnesses all think that the machine has remained unchanged in this particular from the beginning. It seems probable that any one who substituted bars for rollers would make them yield, because the rollers of Woodworth's machine were made in that way. It was not the yielding which was new, but the substitution of bars for rollers. The distinguished expert of the plaintiffs says: "I have never seen a Woodworth planing machine organized with either rollers or bars to bear down the rough stock upon the bed-piece, by acting upon the rough surface of the stock, that was not so constructed as to allow the roller or bar, as the case might be, to yield to the inequalities almost always existing in sawed lumber; nor do I ever expect to see such a machine in practical use." His meaning is, that the machine would stop whenever a board having the usual inequalities was attempted to be passed through it.

In a machine like Anson's, the difficulty might not present itself so often, or so soon, but I should suppose it would make itself felt sooner or later, and would need to be remedied before the machine had been run for a day.

The witnesses, sixteen in number, are all on one side, and include, apparently, all persons now living who ought to be called. They testify from their recollection, with more or less positiveness, and with apparent fairness. None of them points to any change, by which the pressure bars were made yielding, after the machine was finished in 1843, but, as I before said, they all think them unchanged.

Against this there is the evidence, which is entitled to much weight, that the drawings accompanying Anson's application for a patent do not show any opportunity for a yielding pressure, or but little. The model is somewhat damaged, and the suggestion is made that it may have been tampered with. As it appears to-day there is some play to the rods of the pressure bars.

I do not think this negative evidence sufficient to discredit the recollection of the witnesses. The patent which Anson asked for had nothing to do with the bars, and there is no reason to suppose that he understood that there was any such advantage in bars over rollers as Woodbury saw and made known. He was not concerned with the particular matter of a yielding pressure bar; but if he made it to yield, he made the thing which Woodbury is, by a very proper and indeed necessary fiction of the patent law, presumed to have had knowledge of; and, therefore, when Woodbury pointed out the great advantage of this organization, he was merely, in intendment of law, applying an old machine to a more extensive use. I believe him to have been an original and meritorious inventor, but of a change which was not difficult to make or to invent, and of which, as it turns out, he was not the first inventor.

Bill dismissed, with costs.

[This case was taken by appeal to the supreme court, and the decision was there affirmed. 101 U. S. 479.]